UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA

FIRST BANK RICHMOND, N.A.

      Plaintiff,

vs.

CREDIT SUISSE FIRST BOSTON
CORPORATION, also known as Credit Suisse
Securities (USA) LLC, CREDIT SUISSE
FIRST BOSTON MORTGAGE SECURITIES
CORP., DLJ MORTGAGE CAPITAL, INC.,
TRIAD GUARANTY INSURANCE
CORPORATION, SELECT PORTFOLIO
SERVICING, INC. and BANK OF NEW
YORK,

      Defendants.

_____/

Case No. 3:07-CV-0302-TS

1: 07-cv- 1262-LJM -WTL

**COMPLAINT**

    Plaintiff, FIRST BANK RICHMOND, N.A. ("FIRST BANK") sues Defendants CREDIT

SUISSE FIRST BOSTON CORPORATION, a/k/a CREDIT SUISSE SECURITIES (USA) LLC

("CSFB"), CREDIT SUISSE FIRST BOSTON MORTGAGE SECURITIES CORP. ("CSFB

Mortgage"), DLJ MORTGAGE CAPITAL, INC. ("DLJ"), TRIAD GUARANTY INSURANCE

CORPORATION ("TRIAD"), SELECT PORTFOLIO SERVICING, INC. ("SPS") and BANK

OF NEW YORK ("BoNY"), and alleges as follows:

    1.    This is an action involving FIRST BANK'S purchase and ownership of pieces of

security certificates issued by CSFB Mortgage which certificates are collateralized by pools of

individual "sub-prime" mortgage loans on residential real estate.

## JURISDICTION AND VENUE ALLEGATIONS

2.      This is an action for damages and other relief in excess of Seventy-Five Thousand ($75,000.00) Dollars and is within the monetary jurisdiction of this Court.

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337.  In addition, this Court has jurisdiction pursuant to 28 U.S.C. § 1332, as there is complete diversity among the parties and the amount in controversy exceeds $75,000.00.

4.      Venue is proper in this District pursuant to 28 U.S.C. § 1391.  Upon information and belief, substantial and material events and omissions giving rise to this action, including certain transactions, acts, practices and course of business, took place in the Southern District of Indiana.

5.      In connection with the acts alleged herein, the Defendants, directly or indirectly, used means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## THE PARTIES

6.      FIRST BANK is a national bank chartered under the laws of the United States, with its principal place of business at 20 North 9th Street, Richmond, Indiana 47375.

7.      CSFB is a Delaware corporation, with its principal place of business in New York, New York.  CSFB is, and was at all relevant times, a securities broker/dealer licensed to do business in the State of Indiana and is registered with the United States Securities and Exchange Commission ("SEC"), the State of Indiana and the National Association of Securities Dealers, Inc. ("NASD").  CFSB is subject to the laws of the United States and the State of Indiana, and the rules and regulations promulgated thereunder by the SEC and subject to the

2

rules and regulations of the self-regulating organizations ("SROs") of which it is a member, in addition to being subject to its own internal rules and regulations. CSFB was the underwriter of the securities (hereinafter defined as Certificates) that are the subject of this action, and sold those Certificates to investors and other broker-dealers.

8.     CSFB Mortgage is a Delaware corporation, with its principal place of business in New York, New York. CSFB Mortgage is an affiliate of CSFB. CSFB Mortgage acquired from DLJ the mortgage loans which served as collateral for the Securities described herein and assigned the mortgage loans to a trust for the benefit of the holders of the Securities.

9.     DLJ is a Delaware corporation, with its principal place of business in New York, New York. DLJ is an affiliate of CSFB and the seller of the mortgage loans which served as collateral for the Securities.

10.     TRIAD is an Illinois corporation, with its principal place of business in Greensboro, North Carolina. TRIAD issued a mortgage guaranty insurance policy purportedly to cover the mortgage loans which served as collateral for the Securities.

11.     SPS is a Utah corporation, with its principal place of business at 3815 Southwest Temple, Salt Lake City, Utah. SPS is an affiliate of CSFB and is the servicer of the mortgage loans which serve as collateral for the securities.

12.     BoNY is a commercial bank chartered under the laws of the State of New York with its principal place of business in New York, New York. In connection with the transactions alleged herein, BoNY has served as Trustee for the benefit of the holders of the Securities.

13.     This Court may properly exercise personal jurisdiction over each Defendant pursuant to the claims asserted herein and Indiana's Long Arm Statute, Rule 4.4, Indiana Rule of Trial Procedures, since at all times material hereto, each of the Defendants has engaged in

3

substantial and not isolated business activities in Indiana, committed tortious acts in Indiana, breached contracts in Indiana, caused injury to persons in Indiana arising out of an act or omission by Defendants outside and within Indiana, and otherwise engaged in systematic and continuous contact with Indiana.

## FACTUAL BACKGROUND

14.    On or about November 29, 2001, CSFB Mortgage issued a series of Mortgage-Backed Pass-Through Certificates, titled Series 2001-28[1], which were collateralized by pools of "sub-prime" residential real estate mortgages located in Indiana and elsewhere that had been first purchased by DLJ and then sold to CSFB Mortgage (the "Certificates"). The Certificates are what is commonly known in the industry as an "Asset Backed Security" (hereinafter, an "ABS Security").[2]

15.    CSFB purchased the Certificates from CSFB Mortgage on or after November 30, 2001, in order to sell individual pieces (aka "tranches") of the Certificates to purchasers on the open market, including investors and other broker-dealers.

16.    Amongst other actions, in order to facilitate the sale of the Certificates on the open market, on and after October 23, 2001 CSFB:

a.    Published a Prospectus regarding the sale of the Certificates (*see* Exhibit

---

[1] The collateral for CSFB 2001-28 consisted of a mortgage pool of one group of 3,055 fixed rate mortgage loans ("Group I mortgage loans") with an aggregate principal balance of $247,399,776 and a second group of 393 adjustable rate mortgage loans ("Group II mortgage loans") with an aggregate principal balance of $57,521,925. The aggregate principal balance of the two groups was $304,921,701.

[2] On January 18, 2005, the SEC approved the following definition of Asset-Backed Securities:

The term "asset-backed security" is currently defined in Form S-3 to mean a security that is primarily serviced by the cash flows of a discrete pool of receivables or other financial assets either fixed or revolving that by their terms convert into cash within a finite time period plus any rights or other assets designed to assure the securing or timely distribution of proceeds to the security holders.

"A"); and

    b.   Published a November 29, 2001 Prospectus Supplement regarding the sale of the Certificates (*see* Exhibit "B").

17.    The Prospectus and the Prospectus Supplement were prepared and issued with the input, advice, and consent of defendants DLJ, CSFB, CSFB Mortgage, Bank One as trustee (predecessor in interest to defendant BoNY), and Vesta Servicing, L.P. (predecessor in interest to defendant SPS).

18.    Amongst other actions, in order to facilitate the sale of the Certificates on the open market, on and after October 23, 2001 CSFB Mortgage:

    a.   Created trust(s) to hold the Certificates for the benefit of certificate holders and to be administered by Bank One, National Association, as trustee (predecessor in interest to defendant BoNY); and

    b.   Acquired for the benefit of the trust a loan level mortgage guaranty insurance policy issued by Defendant Triad as a "credit enhancement" in order to offer additional security to certificate holders in the trust, and to induce Moody's Rating Service to provide a higher credit rating for the Certificates and thereby making the Certificates more attractive to potential purchasers;[3] and

    c.   Entered into a Pooling and Servicing Agreement dated November 1, 2001 with, amongst others, Vesta Servicing, L.P. (the predecessor in interest to

---

[3] As of November 29, 2001, the date of the Prospectus Supplement, Security I-B-1 was rated Aa2 (very low credit risk and eligible for bank investment) by Moody's with a maturity date of November 25, 2031 and a projected weighted average life of nine (9) years. Moody's rating of the Securities was based on information supplied by CSFB addressing the likelihood that the financial obligations represented by the securities would be honored.

defendant SPS), defendant DLJ Mortgage Capital, Inc., and Bank One National Association as trustee (predecessor in interest to defendant BoNY) (*see* Exhibit "C").

19.     Amongst other things, the Prospectus Supplement issued by CSFB provides that:

   a.   "[n]o mortgage loan [that makes up the pool collateralizing the Certificates] will be delinquent more than 30 days as of the cut-off date." (*See* Exhibit "B", S-19).  The Prospectus Supplement defines the cut-off date as November 1, 2001 (*See* Exhibit "B", S-5); and

   b.   In the event of a breach of any representation or warranty relating to a mortgage loan that materially and adversely affects the interest of the certificateholders in that mortgage loan, the seller of that mortgage loan (including defendant DLJ) would be obligated to do one of the following: (i) cure that breach; (ii) repurchase that mortgage loan ... or (iii) substitute a replacement mortgage loan for that mortgage loan within two years of the closing date (*see* Exhibit "B", S-17 and S-18); and

   c.   That credit support would be provided by over-collateralization[4] ("O/C") of $2,286,915 which would be properly administered; and

   d.   That fraudulent mortgage loans would be put back to DLJ;

   e.   That the mortgage loans would be properly serviced;

---

[4]  The original O/C of $2,286,915 was the difference between the total unpaid principal balance of $304,921,701 of the mortgage loans for the Transaction minus the principal amount sold to investors ($302,634,786).  CSFB, SPS and others conspired to charge loan losses to the O/C account which should have been put back to DLJ, the seller of the mortgage loans, or a claim for insurance should have been filed with TRIAD.  The current balance of the O/C is <u>zero</u> because CSFB, SPS and others have wrongfully charged the O/C for losses that should have been covered by TRIAD insurance or tendered to DLJ in violation of the representations made to FIRST BANK.

f.  That insurance claims would be properly filed and pursued.

20.     Notwithstanding the representation in the Prospectus Supplement that "[n]o mortgage loan will be delinquent more than 30 days as of the cut-off date [November 1, 2001]" the trustee's own Statement to Certificateholders established that there were loans that were delinquent more than 30 days as of the cut-off date.  *See* Exhibit "D", Statement to Certificateholders (Dec. 26, 2001) (at least 132 of the loans underlying the Certificates were more than 30 days delinquent as of November 30, 2001).  Thus, the representation in the Prospectus Supplement that "[n]o mortgage loan will be delinquent more than 30 days as of the cut-off date" was false, and CFSB, CFSB Mortgage, Bank One as trustee (the predecessor in interest to defendant BoNY), and Vesta Servicing, L.P. (predecessor in interest to defendant SPS) (the loan servicer) knew or should have known the representation was false when it was made.

21.     Although Bank One as trustee (predecessor in interest to defendant BoNY), CSFB, CSFB Mortgage, and SPS knew or should have known the Prospectus Supplement was materially misleading and wrong as of the day it was issued, they never issued an amendment or correction to the Prospectus Supplement.

22.     The Trustee, CSFB, CSFB Mortgage, and SPS knew or should have known that third party purchasers of the Certificates would rely on the information in the Prospectus Supplement when purchasing the Certificates or any part thereof.  In fact, the Prospectus Supplement specifically provides that "[y]ou should rely on the information contained in this document or to which we have referred you in this prospectus supplement.  We have not authorized anyone to provide you with information that is different."  (*See* Exhibit "B", S-2).

23.     Additionally, in the Pooling and Servicing Agreement, defendant DLJ represented and warranted, amongst other things, that:

    a.   All payments due prior to the Cut-off Date (November 1, 2001) for such Mortgage Loan have been made as of the Closing Date (November 30, 2001), the Mortgage Loan is not delinquent in payment more than 30 days; and there are no material defaults under the terms of the Mortgage Loan. (*See* Exhibit "C", Schedule III(A)(iii) (p. III-1).

    b.   "No fraud, error, omission, misrepresentation, negligence, or similar occurrence with respect to a Mortgage Loan has taken place on the part of Seller or the Mortgagor, or to the best of the Seller's knowledge, on the part of any other party involved in the origination of the Mortgage Loan." (*See* Exhibit "C", Schedule III(A)(x), p. III-3); and

    c.   Upon discovery of any breach of a representation or warranty that materially and adversely affects the interests of the Certificateholders, the Seller (defendant DLJ) would cure the breach, or, if the breach occurred prior to the second anniversary of the Closing Date, DLJ would have the alternative option of supplying a substitute mortgage loan for the loan that caused the breach, or repurchase the subject mortgage loan. (*See* Exhibit "C," § 2.03(c), p. 47.

24.     The Certificateholders, including but not limited to FIRST BANK, are intended third party beneficiaries to the Pooling and Servicing Agreement.

25.     DLJ knew or should have known that the following representations and warranties that it made as related in the preceding paragraph were false, or were recklessly made:

8

    a.   That all payments due prior to the Cut-Off Date for such Mortgage Loans that formed the collateral for the Certificates had been made as of the Closing Date;

    b.   The Mortgage Loans were not delinquent in payment more than 30 days;

    c.   There are no material defaults under the terms of the Mortgage Loan; and

    d.   That there was no fraud, error, omission, misrepresentation, negligence, or similar occurrence with respect to the Mortgage Loan on the part of Seller or the Mortgagor.

26.    On information and belief, DLJ did not cure the breaches of the foregoing representations and warranties, or repurchase the Mortgage Loans subject to the breach of the representations or warranties, or (within two years of the Closing Date) supply substitute collateral for the breach of the representation or warranty.

27.    Neither Bank One as trustee (predecessor in interest to defendant BoNY) nor SPS as servicer have protected the Certificateholders, including FIRST BANK, by pursuing the remedies available under to the Pooling and Servicing Agreement to force DLJ to cure the breaches relating to the subject Mortgage Loans, or caused DLJ to provide substitute collateral for the Mortgage Loans, or caused DLJ to repurchase the Mortgage Loans.

28.    In January 2003, FIRST BANK purchased tranches of the Certificates, including the tranches identified as Security I-B-1 (hereinafter the "Certificate Tranches").[5]

---

[5] Security I-B-1 was acquired by FIRST BANK in a single purchase as follows:

    a)    $250,000 original face amount on January 30, 2003 at a price of 105 16/32. ($260,083.61). The current face of I-B-1 at the time of purchase was $246,524.75.

29.     At the time or prior to FIRST BANK's purchase of the Certificate Tranches, neither CSFB, CFSB Mortgage, SPS, nor Bank One as trustee (the predecessor in interest to defendant BoNY) had: (a) made any amendment or correction to the Prospectus Supplement (commonly known in the industry as a "sticker," where corrective information may be displayed on a sticker pasted to the Prospectus Supplement) or any of the Statements to Certificate holders; (b) informed potential purchasers of the Certificates, including FIRST BANK, that neither SPS nor Bank One as trustee had sought to enforce against DLJ as seller their rights under the Pooling and Servicing Agreement to prevent the impairment of the collateral and its concomitant diminution in value; or (c) informed potential purchasers, including FIRST BANK, that the insurer (Triad) had declined to cover many of the mortgage loans in the pool on the basis, amongst other things, that the loans had been procured through the use of fraud; or (d) informed potential purchasers, including FIRST BANK, that neither SPS nor Bank One as trustee had sought to enforce their legal remedies against the insurer for denying insurance coverage for many of the delinquent mortgage loans.

30.     Prior to FIRST BANK's purchase of the Certificate Tranches, neither CSFB, CSFB Mortgage, SPS, nor Bank One as trustee notified Moody's Rating Service, a source commonly relied on in the industry by investors in making decisions to purchase or not purchase particular securities, and for ratings on various securities, including the Certificates at issue in this case, that (a) there were numerous loan delinquencies and defaults in the pool; and (b) SPS had not enforced against DLJ as seller its rights under the Pooling and Servicing Agreement to prevent the impairment of the collateral and its concomitant diminution in value; and (c) that the insurer had declined to cover many of the mortgage loans in the pool on the basis, amongst other things, that the loans had been procured through the use of fraud; or (d) that neither Bank One as

trustee nor SPS as servicer had sought to enforce their rights against the insurer for denying insurance coverage for many of the delinquent Mortgage Loans. Had this information been disclosed to Moody's, it would have certainly resulted in an earlier downgrade of the Certificates by Moody's.

31.     On the date FIRST BANK purchased (January 30, 2003) Security I-B-1, the Moody's rating was still Aa2, the same as it was at the time of original distribution.

32.     Following the purchase of the Securities by FIRST BANK in January 2003, Security I-B-1 suffered a series of Moody's rating downgrades which commenced in January, 2005.[6]  Had a downgrade been made prior to FIRST BANK's purchase, FIRST BANK would not have purchased the Securities.

33.     Moreover, if CSFB, CSFB Mortgage, Bank One as trustee (predecessor in interest to defendant BoNY), or SPS as servicer published information to reflect the problems with loan delinquencies and the improper administration of the insurance related and other credit enhancements prior to purchase, FIRST BANK would not have purchased the Certificate Tranches.

---

[6] Security I-B-1 suffered a series of Moody's rating downgrades as follows:

| Rating[6] | Date of Downgrade |
|---|---|
| Aa2*- | 1/05 |
| A3 | 3/05 |
| A3*- | 7/05 |
| Baa3 | 9/05 |
| Baa3*- | 7/06 |
| B1 | 5/11/07 |

34.     Had the Securities been properly downgraded to reflect the problems with loan delinquencies and the improper administration of the insurance related and other credit enhancements prior to purchase, FIRST BANK would not have purchased the Certificate Tranches.

35.     All of the foregoing representations regarding the collateral and credit enhancements, coupled with the falsely maintained investment grade ratings of the Securities by Moody's, due to CSFB's misrepresentations and omissions, and CSFB's reputation and marketing efforts regarding the nature and minimal risk of the Securities, induced FIRST BANK to purchase Security I-B-1 as set forth above.

36.     All conditions precedent to the institution of this action have occurred, have been excused, are futile or impossible, are satisfied, or have been otherwise waived.

## Count I

### Negligent Misrepresentation Against CSFB

37.     FIRST BANK repeats and realleges each and every allegation contained in Paragraphs 1 through 36 above, with the same force and effect as if set forth fully herein.

38.     As more fully described above, CSFB made misrepresentations of material fact and omitted material facts to the investing public, including FIRST BANK, in connection with the Transaction and the purchase by FIRST BANK of Security I-B-1.   Specifically, CSFB represented in the Prospectus Supplement that "no mortgage loan will be delinquent more than 30 days as of the cut-off date."

39.     In addition, CSFB, after the creation and issuance of the Securities, continued to misrepresent material facts by omitting material facts and concealing the condition of the loan pool. CSFB knew that the investing public would be relying upon the Prospectus, the Prospectus

Supplement, the terms of the Pooling and Servicing Agreement, and the Moody's rating in deciding whether or not to purchase the Securities, but CSFB as underwriter never updated (stickered as set forth above) these documents, as is customary in the industry, to reflect that: (a) insurance coverage had been denied for a substantial portion of the mortgage loans constituting the mortgage pool; (b) the servicer had not enforced its legal rights under the Pooling and Servicing Agreement; (c) the trustee had not reported information to the rating agencies (e.g., Moody's) relied on by the investing public, regarding the status of the loans constituting the mortgage pools; (d) the trustee had not reported information to the rating agencies (e.g., Moody's) relied on by the investing public regarding the insurance coverage available (or lack thereof) in connection with the Pooling and Servicing Agreement; (e) the trustee had not enforced its rights under the Pooling and Servicing Agreement against the insurer under the Pooling and Servicing Agreement; or (f) the trustee had not enforced its rights under the Pooling and Servicing Agreement against the Seller (DLJ) to cure loan defaults.

40. FIRST BANK would not have purchased the Certificate Tranches if: (a) CSFB had published any of the information referred to in the preceding paragraph; (b) the Prospectus Supplement accurately stated the status of the loans as of the Closing Date; or (c) the Prospectus Supplement had been updated ("stickered" as referred to hereinabove) after its issuance.

41. CSFB failed to use reasonable care when supplying the false information described above, or when omitting to publish accurate information, and knew or should have known that the information would be used by members of the investing public, including FIRST BANK, to purchase the Securities.

42.    CSFB made the foregoing misrepresentations and/or omissions with the intent to influence purchases of the Securities.

43.    FIRST BANK reasonably and justifiably relied on misrepresentations made by CSFB, or the misrepresentations CSFB made by omission, in deciding to purchase Security I-B-1.

44.    But for CSFB's conduct, FIRST BANK would not have purchased Security I-B-1.

45.    As a direct and proximate result of CSFB's conduct, CSFB has caused FIRST BANK to incur substantial monetary damages.

46.    CSFB's actions as more fully described above were willful, oppressive and malicious; therefore FIRST BANK reserves its right to bring a claim for punitive damages.

WHEREFORE, FIRST BANK respectfully requests that this Court enter a judgment in its favor for:

(a)    its damages caused by CFSB's negligent misrepresentation, plus pre-judgment and post-judgment interest; and

(b)    such other and further relief as this Court considers appropriate.

### Count II

**False Information Negligently Supplied for the Guidance of Others against CSFB**

47.    FIRST BANK repeats and realleges each and every allegation contained in Paragraphs 1 through 36 above, with the same force and effect as if set forth fully herein.

48.    FIRST BANK is one of a limited group of persons for whose benefit and guidance CSFB intended to supply the information contained in the Prospectus and the Prospectus Supplement.

49.    CSFB intended the information in the Prospectus and the Prospectus Supplement to influence the limited group of persons who are purchasers of the Certificates, like FIRST BANK, to influence FIRST BANK's purchase of the Certificate Tranches.

50.    As more fully described above, CSFB made misrepresentations of material fact and omitted material facts to the investing public, including FIRST BANK, in connection with the Transaction and the purchase by FIRST BANK of Security I-B-1.   Specifically, CSFB represented in the Prospectus Supplement that "no mortgage loan will be delinquent more than 30 days as of the cut-off date."

51.    Additionally, CSFB, after the creation and issuance of the Securities, continued to misrepresent material facts by omitting material facts and concealing the condition of the loan pool.  CSFB knew that the investing public would be relying upon the Prospectus, the Prospectus Supplement, the terms of the Pooling and Servicing Agreement, and the Moody's rating in deciding whether or not to purchase the Securities, but CSFB as underwriter never updated (stickered as set forth above) these documents, as is customary in the industry, to reflect that: (a) insurance coverage had been denied for a substantial portion of the mortgage loans constituting the mortgage pool; (b) the servicer had not enforced its legal rights under the Pooling and Servicing Agreement; (c) the trustee had not reported information to the rating agencies (e.g., Moody's) relied on by the investing public, regarding the status of the loans constituting the mortgage pools; (d) the trustee had not reported information to the rating agencies (e.g., Moody's) relied on by the investing public regarding the insurance coverage available (or lack thereof) in connection with the Pooling and Servicing Agreement; (e) the trustee had not enforced its rights under the Pooling and Servicing Agreement against the insurer under the

Pooling and Servicing Agreement; or (f) the trustee had not enforced its rights under the Pooling and Servicing Agreement against the Seller (DLJ) to cure loan defaults.

52.    FIRST BANK would not have purchased the Certificate Tranches if: (a) CSFB had published any of the information referred to in the preceding paragraph; (b) the Prospectus Supplement accurately stated the status of the loans as of the Closing Date; or (c) the Prospectus Supplement had been updated ("stickered" as referred to hereinabove) after its issuance.

53.    CSFB supplied false information for the guidance of others (in this case, the class of investors purchasing the Certificates, like FIRST BANK) in their business transactions.

54.    FIRST BANK justifiably relied on the false information published by CSFB when FIRST BANK purchased the Certificate Tranches.

55.    FIRST BANK suffered pecuniary loss and has been damaged by CSFB's false information.

56.    CSFB's actions as more fully described above were willful, oppressive and malicious; therefore FIRST BANK reserves its right to bring a claim for punitive damages.

WHEREFORE, FIRST BANK respectfully requests that this Court enter a judgment in its favor for:

(a)    its damages caused by CFSB's false information, plus pre-judgment and post-judgment interest; and

(b)    such other and further relief as this Court considers appropriate.

## COUNT III

### Common Law Fraud Against CSFB

57.     FIRST BANK repeats and realleges each and every allegation contained in Paragraphs 1 through 36 above, with the same force and effect as if set forth fully herein.

58.     As more fully described above, CSFB made misrepresentations of material fact and omitted material facts to the investing public, including FIRST BANK, in connection with the Transaction and the purchase by FIRST BANK of Security I-B-1.

59.     In addition, CSFB, after the creation and issuance of the Securities, continued to misrepresent material facts, omitted material facts and intentionally concealed the true nature of the Transaction.  CSFB knew that the investing public would be relying upon the Prospectus, the Prospectus Supplement, and the Moody's rating in deciding whether or not to purchase the Securities.

60.     Had CSFB updated the Prospectus Supplement to accurately reflect the status of the collateral for the Certificates, FIRST BANK would not have purchased the Certificate Tranches.

61.     CSFB knew or should have known of the falsity of the misrepresentations, as well as the omissions, and made the foregoing misrepresentations and/or omissions with the intent to influence purchases of the Certificate Tranches.

62.     FIRST BANK reasonably and justifiably relied on the reputation of CSFB, the Moody's rating (controlled by CSFB) and the various misrepresentations and/or omissions made by CSFB and purchased Security I-B-1.

63.     But for CSFB's conduct, FIRST BANK would not have purchased Security I-B-1.

64.     As a direct and proximate result of CSFB's conduct, CSFB has caused FIRST BANK to incur substantial monetary damages.

65.     CSFB's actions as more fully described above were willful, oppressive and malicious; therefore FIRST BANK reserves its right to bring a claim for punitive damages.

WHEREFORE, FIRST BANK respectfully requests that this Court enter a judgment in its favor for:

(a)     its damages caused by CFSB's fraud, plus pre-judgment and post-judgment interest; and

(b)     such other and further relief as this Court considers appropriate.

## COUNT IV

### Breach of Fiduciary Duty Against CSFB

66.     FIRST BANK repeats and realleges each and every allegation contained in Paragraphs 1 through 36 above, with the same force and effect as if set forth fully herein.

67.     CSFB offered the Certificates to the investing public, including FIRST BANK, in the State of Indiana.

68.     CSFB, their officers, agents and employees, held themselves out to the certificateholders, including FIRST BANK, as having knowledge and expertise in the area of ABS Securities and sought to obtain FIRST BANK's trust, confidence and reliance, and thus, owed FIRST BANK a fiduciary duty of full disclosure, honesty and complete candor and loyalty in their dealings.

69.     CSFB knew, or reasonably should have known, that FIRST BANK would be relying on the information being disseminated regarding the Securities.

18

70.     CSFB owed FIRST BANK the duty to make full disclosure of all material facts necessary for FIRST BANK to make informed investment decisions.

71.     CSFB owed FIRST BANK a fiduciary duty to act in a fair, honest, just, trustworthy and equitable manner.

72.     CSFB breached its fiduciary duties to FIRST BANK in a willful, reckless and negligent manner by undertaking to harm FIRST BANK, by making misrepresentations of material fact and omitting material facts that caused substantial losses to FIRST BANK.

73.     As a direct and proximate result of the foregoing, FIRST BANK has been substantially damaged in an amount to be subsequently determined.

74.     CSFB's actions were willful, oppressive and malicious, therefore FIRST BANK reserves its right to bring a claim for punitive damages.

WHEREFORE, FIRST BANK respectfully requests that this Court enter a judgment in its favor for:

(a)     its damages caused by CFSB's breach of fiduciary duty, plus pre-judgment and post-judgment interest; and

(b)     such other and further relief as this Court considers appropriate.

## Count V

### Negligent Misrepresentation Against CSFB Mortgage

75.     FIRST BANK repeats and realleges each and every allegation contained in Paragraphs 1 through 36 above, with the same force and effect as if set forth fully herein.

76.     As more fully described above, CSFB Mortgage made misrepresentations of material fact and omitted material facts to the investing public, including FIRST BANK, in connection with the Transaction and the purchase by FIRST BANK of Security I-B-1.

Specifically, CSFB Mortgage represented in the Prospectus Supplement that "no mortgage loan will be delinquent more than 30 days as of the cut-off date."

77.     FIRST BANK would not have purchased the Certificate Tranches if: (a) CSFB Mortgage had published any of the information referred to in the preceding paragraph; (b) the Prospectus Supplement accurately stated the status of the loans as of the Closing Date; or (c) the Prospectus Supplement had been updated ("stickered" as referred to hereinabove) after its issuance.

78.     CSFB Mortgage failed to use reasonable care when supplying the false information described above, or when omitting to publish accurate information, and knew or should have known that the information would be used by members of the investing public, including FIRST BANK, to purchase the Securities.

79.     CSFB Mortgage made the foregoing misrepresentations and/or omissions with the intent to influence purchases of the Securities.

80.     FIRST BANK reasonably and justifiably relied on misrepresentations made by CSFB Mortgage, or the misrepresentations CSFB Mortgage made by omission, in deciding to purchase Security I-B-1.

81.     But for CSFB Mortgage's conduct, FIRST BANK would not have purchased Security I-B-1.

82.      As a direct and proximate result of CSFB Mortgage's conduct, CSFB Mortgage has caused FIRST BANK to incur substantial monetary damages.

83.     CSFB Mortgage's actions as more fully described above were willful, oppressive and malicious; therefore FIRST BANK reserves its right to bring a claim for punitive damages.

WHEREFORE, FIRST BANK respectfully requests that this Court enter a judgment in its favor for:

(a)      its damages caused by CFSB Mortgage's negligent misrepresentation, plus pre-judgment and post-judgment interest; and

(b)      such other and further relief as this Court considers appropriate.

### Count VI

### False Information Negligently Supplied for the Guidance of Others against CSFB Mortgage

84.      FIRST BANK repeats and realleges each and every allegation contained in Paragraphs 1 through 36 above, with the same force and effect as if set forth fully herein.

85.      FIRST BANK is one of a limited group of persons for whose benefit and guidance CSFB Mortgage intended to supply the information contained in the Prospectus and the Prospectus Supplement.

86.      CSFB Mortgage intended the information in the Prospectus and the Prospectus Supplement to influence the limited group of persons who are purchasers of the Certificates, like FIRST BANK, to influence FIRST BANK's purchase of the Certificate Tranches.

87.      As more fully described above, CSFB Mortgage made misrepresentations of material fact and omitted material facts to the investing public, including FIRST BANK, in connection with the Transaction and the purchase by FIRST BANK of Security I-B-1. Specifically, CSFB Mortgage represented in the Prospectus Supplement that "no mortgage loan will be delinquent more than 30 days as of the cut-off date."

88.      FIRST BANK would not have purchased the Certificate Tranches if: (a) CSFB Mortgage had published any of the information referred to in the preceding paragraph; (b) the Prospectus Supplement accurately stated the status of the loans as of the Closing Date; or (c) the

Prospectus Supplement had been updated ("stickered" as referred to hereinabove) after its issuance.

89.     CSFB Mortgage supplied false information for the guidance of others (in this case, the class of investors purchasing the Certificates, like FIRST BANK) in their business transactions.

90.     FIRST BANK justifiably relied on the false information published by CSFB Mortgage when FIRST BANK purchased the Certificate Tranches.

91.     FIRST BANK suffered pecuniary loss and has been damaged by CSFB Mortgage's false information.

92.     CSFB Mortgage's actions as more fully described above were willful, oppressive and malicious; therefore FIRST BANK reserves its right to bring a claim for punitive damages.

WHEREFORE, FIRST BANK respectfully requests that this Court enter a judgment in its favor for:

(a)     its damages caused by CFSB Mortgage's false information, plus pre-judgment and post-judgment interest; and

(b)     such other and further relief as this Court considers appropriate.

### Count VII

### Common Law Fraud Against CSFB Mortgage

93.     FIRST BANK repeats and realleges each and every allegation contained in Paragraphs 1 through 36 above, with the same force and effect as if set forth fully herein.

94.     As more fully described above, CSFB Mortgage made misrepresentations of material fact and omitted material facts to the investing public, including FIRST BANK, in connection with the Transaction and the purchase by FIRST BANK of Security I-B-1.

22

95.     Specifically, CSFB Mortgage represented in the Prospectus Supplement that "no mortgage loan will be delinquent more than 30 days as of the cut-off date."   The foregoing statement was false, and CSFB Mortgage knew or should have known it was false when made.

96.     FIRST BANK would not have purchased the Certificate Tranches if CFSB Mortgage had disclosed that there were mortgage loans that were delinquent more than 30 days as of the cut-off date.

97.     CSFB Mortgage made the foregoing misrepresentations and/or omissions with the intent to influence purchases of the Certificates.

98.     FIRST BANK reasonably and justifiably relied on the information provided by CSFB Mortgage in deciding to purchase the Certificate Tranches.

99.     But for the misrepresentations of CSFB Mortgage, FIRST BANK would not otherwise have purchased the Certificates.

100.    As a direct and proximate result of CSFB Mortgage's conduct, CSFB Mortgage has caused FIRST BANK to incur substantial monetary damages.

101.    CSFB Mortgage's actions as more fully described above were willful, oppressive and malicious; therefore FIRST BANK reserves its right to bring a claim for punitive damages.

WHEREFORE, FIRST BANK respectfully requests that this Court enter a judgment in its favor for:

(a)     its damages caused by CFSB Mortgage's fraud, plus pre-judgment and post-judgment interest; and

(b)     such other and further relief as this Court considers appropriate.

## Count VIII

## Breach of Contract Against TRIAD

102.    FIRST BANK repeats and realleges each and every allegation contained in Paragraphs 1 through 36 above, with the same force and effect as if set forth fully herein.

103.    BONY and TRIAD entered into an agreement whereby TRIAD was to provide mortgage loan guaranty insurance to protect and indemnify the Securities.  A true and correct copy of the TRIAD insurance policy is attached hereto as Exhibit "E."

104.    The mortgage loan guaranty insurance was procured for the benefit of Certificate holders, who were specifically instructed in the Prospectus Supplement to rely on the existence of said insurance in determining whether to purchase the Certificates.

105.    FIRST BANK is an intended third party beneficiary of the insurance policy between BoNY and TRIAD, because: (a) the insurance policy expresses an intent to primarily and directly benefit the class of persons to which FIRST BANK belongs; that is, Bank One, N.A. as trustee for CSFB Mortgage-Backed Pass-Through Certificates Series 2001-28; and (b) all of the parties to the insurance policy intended to benefit the class of persons to which FIRST BANK belongs; that is, the owners of the Certificates.

106.    The foregoing agreement to provide mortgage loan guaranty insurance was for the intended benefit of all certificateholders, including FIRST BANK.

107.    The foregoing agreement to provide mortgage loan guaranty insurance was breached by TRIAD as more fully set forth above.

108.    As a direct and proximate result of TRIAD's breach of the agreement to provide mortgage loan guaranty insurance, FIRST BANK has suffered damage.

WHEREFORE, FIRST BANK respectfully requests that this Court enter a judgment in its favor for:

(a)    its damages caused by Triad's breach of contract, plus pre-judgment and post-judgment interest; and

(b)    such other and further relief as this Court considers appropriate.

### Count IX

### Breach of Contract Against DLJ

109.   FIRST BANK repeats and realleges each and every allegation contained in Paragraphs 1 through 36 above, with the same force and effect as if set forth fully herein.

110.   FIRST BANK is an intended third party beneficiary of the Pooling and Servicing Agreement, because: (a) the Pooling and Servicing Agreement clearly expresses an intent to primarily and directly benefit the class of persons to which FIRST BANK belongs; that is, owners of the Certificates or of any part thereof; and (b) all of the parties to the Pooling and Servicing Agreement intended to benefit the class of persons to which FIRST BANK belongs.

111.   Under § 2.03 of the Pooling and Servicing Agreement, DLJ was obligated to cure any breaches of the representations and warranties referred to thereunder and in Schedules IIA, IIB, IIC, IIIA, and IIIB.

112.   DLJ has breached the Pooling and Servicing Agreement, because DLJ has not cured the breaches of its representations and warranties as set forth within § 2.03(c) of the Pooling and Servicing Agreement.

113.   As a direct and proximate result of DLJ's conduct, DLJ has caused FIRST BANK to incur substantial monetary damages.

WHEREFORE, FIRST BANK respectfully requests that this Court enter a judgment in its favor for:

(a)     its damages caused by DLJ's breach of contract, plus pre-judgment and post-judgment interest; and

(b)     such other and further relief as this Court considers appropriate.

## Count X

## Breach of Fiduciary Duty Against SPS

114.   FIRST BANK repeats and realleges each and every allegation contained in Paragraphs 1 through 36 above, with the same force and effect as if set forth fully herein.

115.   SPS is the servicer of the mortgage pool constituting the collateral for the Certificates.

116.   SPS, their officers, agents and employees, held themselves out to the certificateholders, including FIRST BANK, as having knowledge and expertise in the area of ABS Securities and sought to obtain FIRST BANK's trust, confidence and reliance, and thus, owed FIRST BANK a fiduciary duty of full disclosure, honesty and complete candor and loyalty in their dealings.

117.   SPS knew, or reasonably should have known, that FIRST BANK would be relying on the information being disseminated regarding the Securities.

118.   SPS owed FIRST BANK the duty to make full disclosure of all material facts necessary for FIRST BANK to make informed investment decisions.

119.   SPS owed FIRST BANK a fiduciary duty to act in a fair, honest, just, trustworthy and equitable manner.

120.   SPS breached its fiduciary duties to FIRST BANK in a willful, reckless and negligent manner by undertaking to harm FIRST BANK, by making misrepresentations of material fact and omitting material facts that caused substantial losses to FIRST BANK.

121.   As a direct and proximate result of the foregoing, FIRST BANK has been substantially damaged in an amount to be subsequently determined.

122.   SPS's actions were willful, oppressive and malicious, therefore FIRST BANK reserves its right to bring a claim for punitive damages.

WHEREFORE, FIRST BANK respectfully requests that this Court enter a judgment in its favor for:

(a)   its damages caused by SPS' breach of fiduciary duty, plus pre-judgment and post-judgment interest; and

(b)   such other and further relief as this Court considers appropriate.

## Count XI

### Breach of Contract against SPS (affirmative actions)

123.   FIRST BANK repeats and realleges each and every allegation contained in Paragraphs 1 through 36 above, with the same force and effect as if set forth fully herein.

124.   FIRST BANK is an intended third party beneficiary of the Pooling and Servicing Agreement, because: (a) the Pooling and Servicing Agreement clearly expresses an intent to primarily and directly benefit the class of persons to which FIRST BANK belongs; that is, owners of the Certificates or of any part thereof; and (b) all of the parties to the Pooling and Servicing Agreement intended to benefit the class of persons to which FIRST BANK belongs.

125.   Under the Pooling and Servicing Agreement, SPS was obligated to (a) pursue claims for insurance coverage regarding the loans in the pool (see Exhibit "C," § 3.09); and (b) foreclose on delinquent loans (see Exhibit "C," § 3.11);

126.   SPS breached the Pooling and Servicing Agreement by failing to enforce its rights and carry out its duties under §§ 3.09 and 3.11 of the Pooling and Servicing Agreement.

127.   FIRST BANK has been damaged by SPS's breach of the Pooling and Servicing Agreement.

WHEREFORE, FIRST BANK respectfully requests that this Court enter a judgment in its favor for:

(a)   its damages caused by SPS's breach of contract, plus pre-judgment and post-judgment interest; and

(b)   such other and further relief as this Court considers appropriate.

## Count XII

### Breach of Contract against SPS (reporting)

128.   FIRST BANK repeats and realleges each and every allegation contained in Paragraphs 1 through 36 above, with the same force and effect as if set forth fully herein.

129.   FIRST BANK is an intended third party beneficiary of the Pooling and Servicing Agreement, because: (a) the Pooling and Servicing Agreement clearly expresses an intent to primarily and directly benefit the class of persons to which FIRST BANK belongs; that is, owners of the Certificates or of any part thereof; and (b) all of the parties to the Pooling and Servicing Agreement intended to benefit the class of persons to which FIRST BANK belongs.

130.   Under the Pooling and Servicing Agreement, SPS was obligated to provide loan information to the Trustee (See Exhibit "C," §§ 2.07(m) and 3.07(a)).

131.   SPS breached the Pooling and Servicing Agreement by failing to supply the Trustee with complete and accurate information regarding the mortgage loans constituting the pool collateralizing the Certificates.

132.   FIRST BANK has been damaged by SPS's breach of the Pooling and Servicing Agreement.

WHEREFORE, FIRST BANK respectfully requests that this Court enter a judgment in its favor for:

(a)   its damages caused by SPS's breach of contract, plus pre-judgment and post-judgment interest; and

(b)   such other and further relief as this Court considers appropriate.

### Count XIII

### Breach of Contract against SPS
### Enforcement of Rights against DLJ as Seller to Cure Defaults

133.   FIRST BANK repeats and realleges each and every allegation contained in Paragraphs 1 through 36 above, with the same force and effect as if set forth fully herein.

134.   FIRST BANK is an intended third party beneficiary of the Pooling and Servicing Agreement, because: (a) the Pooling and Servicing Agreement clearly expresses an intent to primarily and directly benefit the class of persons to which FIRST BANK belongs; that is, owners of the Certificates or of any part thereof; and (b) all of the parties to the Pooling and Servicing Agreement intended to benefit the class of persons to which FIRST BANK belongs.

135.   SPS knew or should have known that DLJ as Seller has not satisfied its obligations under § 2.03 of the Pooling and Servicing Agreement to cure breaches of the representations and warranties set forth in Schedules IIA, IIB, IIC, IIIA, and IIIB.

136.   In addition to its other duties under the Pooling and Servicing Agreement, under

Section 3.01 of the Pooling and Servicing Agreement, SPS as servicer was obligated to "represent and protect the interests of the Trust Fund in the same manner as it protects its own interests in mortgage loans in its own portfolio in any claim, proceeding or litigation regarding a Mortgage Loan ..."

137.    Under Section 3.11 of the Pooling and Servicing Agreement, SPS was obligated to "use reasonable efforts to foreclose upon or otherwise comparably convert the ownership of properties securing such of the related Mortgage Loans as come into and continue in default ..."

138.    SPS did not enforce DLJ's obligations under the Pooling and Servicing Agreement to cure breaches, as more fully set forth in § 2.03 of the Pooling and Servicing Agreement, and SPS has consequently breached the Pooling and Servicing Agreement.

139.    FIRST BANK has been damaged by SPS's breach of the Pooling and Servicing Agreement.

WHEREFORE, FIRST BANK respectfully requests that this Court enter a judgment in its favor for:

(a)    its damages caused by SPS's breach of contract, plus pre-judgment and post-judgment interest; and

(b)    such other and further relief as this Court considers appropriate.

### Count XIV

### Breach of Contract Against BONY (Information to Rating Agencies)

140.    FIRST BANK repeats and realleges each and every allegation contained in Paragraphs 1 through 36 above, with the same force and effect as if set forth fully herein.

141.    FIRST BANK is an intended third party beneficiary of the Pooling and Servicing Agreement, because: (a) the Pooling and Servicing Agreement clearly expresses an intent to

primarily and directly benefit the class of persons to which FIRST BANK belongs; that is, owners of the Certificates or of any part thereof; and (b) all of the parties to the Pooling and Servicing Agreement intended to benefit the class of persons to which FIRST BANK belongs.

142.   Under § 11.05 of the Pooling and Servicing Agreement, BoNY was required to provide to Rating Agencies, in writing, notice of (a) any substitution of any Mortgage Loan; (b) any payment or draw on any insurance policy applicable to the Mortgage Loans; (c) of the final payment of any amount owing to a Class of Certificates; (d) any Event of Default under this Agreement; and (e) any Mortgage Loan repurchased in accordance with the Pooling and Servicing Agreement.  BoNY failed these requirements and FIRST BANK has been damaged as a result.

WHEREFORE, FIRST BANK respectfully requests that this Court enter a judgment in its favor for:

(a)    its damages caused by BoNY's breach of contract, plus pre-judgment and post-judgment interest; and

(b)    such other and further relief as this Court considers appropriate.

### Count XV

### Breach of Contract Against BONY (Information to Certificateholders)

143.   FIRST BANK repeats and realleges each and every allegation contained in Paragraphs 1 through 36 above, with the same force and effect as if set forth fully herein.

144.   FIRST BANK is an intended third party beneficiary of the Pooling and Servicing Agreement, because: (a) the Pooling and Servicing Agreement clearly expresses an intent to primarily and directly benefit the class of persons to which FIRST BANK belongs; that is,

owners of the Certificates or of any part thereof; and (b) all of the parties to the Pooling and Servicing Agreement intended to benefit the class of persons to which FIRST BANK belongs.

145. Under § 4.04 of the Pooling and Servicing Agreement, BoNY was required to provide monthly statement to Certificateholders, including FIRST BANK, regarding various aspects of the Mortgage Loans and the Certificates, including, but not limited to, (a) the number and aggregate principal amounts of the foreclosure loans that were in foreclosure or delinquent (§ 4.4(ix)); (b) the number and principal amount of claims submitted under the insurance policy (§ 4.4(xiv)).

146. BoNY breached § 4.04 of the Pooling and Servicing Agreement by failing to provide full and accurate information to FIRST BANK as a Certificateholder, in accordance with the Pooling and Servicing Agreement.

147. FIRST BANK has been damaged by BoNY's breach of the Pooling and Servicing Agreement.

WHEREFORE, FIRST BANK respectfully requests that this Court enter a judgment in its favor for:

(a)     its damages caused by BoNY's breach of contract, plus pre-judgment and post-judgment interest; and

(b)     such other and further relief as this Court considers appropriate.

### Count XVI

### Breach of Fiduciary Duty by BoNY

148. FIRST BANK repeats and realleges each and every allegation contained in Paragraphs 1 through 36 above, with the same force and effect as if set forth fully herein.

149.    As Trustee, BoNY had a duty to act on behalf of FIRST BANK and other certificateholders without regard to the interests of any other party.

150.    BoNY, as trustee, was in a unique position to enforce the Pooling and Servicing Agreement and to prevent harm to the certificateholders.

151.    BoNY, as trustee, had a duty to make full disclosure and to act fairly and honestly to and toward the certificateholders.

152.    BoNY was responsible for, and obligated to disclose to FIRST BANK and other certificateholders, the number and principal amount of claims submitted and claims paid under the TRIAD policy during the preceding calendar month and the aggregate number and principal amount of claims paid under the TRIAD policy.

153.    BoNY had a duty to ask SPS as to why the insurance claims information was not being provided, especially in light of FIRST BANK's repeated requests to BoNY to provide this information.

154.    BoNY had a duty to certificateholders, including FIRST BANK, to request SPS to provide requested data regarding TRIAD claims and to insist that SPS and TRIAD process appropriate mortgage insurance claims.

155.    BoNY, failed to act in the interests of its beneficiaries and instead stood idly by, which contributed materially to the losses suffered by FIRST BANK.

156.    BoNY has conspired with the other Defendants to cover up their collective misdeeds, fraudulent activity, negligence and other violations discussed above.

157.    Had FIRST BANK known that BoNY would not properly perform its obligations as Trustee, FIRST BANK would not have agreed to purchase the Securities. BoNY's failure to act also prevented FIRST BANK from taking action to mitigate its damages.

33

158.    BoNY knew or should have known that FIRST BANK would rely on BoNY's misrepresentations and omissions of material fact in both purchasing the Certificate Tranches and in deciding when to sell or not to sell the Certificate Tranches.

159.    FIRST BANK is aware of Section 11.07 of the Pooling and Servicing Agreement; however, in light of BoNY's prior refusals to respond to any of FIRST BANK's requests, coupled with the fraud committed by all Defendants and the fact that BoNY would be required to sue itself, any demand by FIRST BANK would be futile.

160.    Additionally, and notwithstanding the foregoing, FIRST BANK has attempted on several occasions to obtain information from BoNY regarding the other certificateholders involved in the Transaction; however, BoNY has refused to provide the requested information.

161.    FIRST BANK has been damaged as a result of BoNY's breach of fiduciary duty.

WHEREFORE, FIRST BANK respectfully requests that this Court enter a judgment in its favor for:

(a)     its damages caused by BoNY's breach of fiduciary duty, plus pre-judgment and post-judgment interest; and

(b)     such other and further relief as this Court considers appropriate.

## Count XVII

### Civil Conspiracy Against CSFB, CSFB Mortgage, BoNY, DLJ, and SPS

162.    FIRST BANK repeats and realleges each and every allegation contained in paragraphs 1 through 36 above, with the same force and effect as if set forth fully herein.

163.    All of the Defendants, acting in concert with one another, conspired and agreed to (i) develop and implement the foregoing scheme to defraud; and (ii) make the material misrepresentations set forth above; and (iii) breach the Pooling and Servicing Agreement.

164.   Defendants each made overt acts in furtherance of the conspiracy as specifically set forth in greater detail above.

165.   As a result, Defendants obtained the power to accomplish the unlawful purpose which they could not accomplish individually.

166.   As a direct and proximate result of the foregoing, FIRST BANK has suffered substantial damages.

WHEREFORE, FIRST BANK respectfully requests that this Court enter a judgment in its favor for:

(a)   its damages caused by defendants' conspiracy, plus pre-judgment and post-judgment interest; and

(b)   such other and further relief as this Court considers appropriate.

### Count XVIII

### Violation of the Indiana Securities Act at I.C. 23-2-1-12, Against CSFB

167.   FIRST BANK repeats and realleges each and every allegation contained in Paragraphs "1" through "36" above, with the same force and effect as if set forth fully herein.

168.   This is an action pursuant to the Indiana Securities Act at I.C. 23-2-1-12, which deals with securities violations.

169.   I.C. 23-2-1-12, states:

### Fraudulent or deceitful acts

Sec. 12.   It is unlawful for any person in connection with the offer, sale or purchase of any security, either directly or indirectly, (1) to employ any device, scheme or artifice to defraud; or (2) to make any untrue statements of material fact or to omit to state a material fact necessary in order to make the statement made in light of the circumstances under which they are made, not misleading; or (3) to engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon a person.

170.     As more fully described above, CSFB carried out a plan, scheme and/or course of conduct which was intended to, and did manipulate and inflate the value of the Security I-B-1 by making the material misrepresentations and/or omissions more fully described above.

171.     CSFB (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; (c) engaged in acts, practices or a course of conduct which operated as a fraud and deceit upon the purchasers of the Securities in violation of I.C. 23-2-1-12, Indiana Statutes.

172.     CSFB had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that it failed to ascertain and to disclose such facts, even though they were readily available.

173.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the purchasers of the Securities have been irreparably injured and their Securities have greatly diminished in value.

174.     Unaware of the foregoing scheme to defraud by CSFB, and relying on the false and misleading statements and/or on the absence of material adverse information known to or recklessly disregarded by CSFB, FIRST BANK was damaged.

175.     At the time said misrepresentations were made, FIRST BANK was unaware of their falsity and believed them to be true.

176.     By virtue of the foregoing, CSFB violated I.C. 23-2-1-12, Indiana Statutes.

177.     As a direct and proximate result of CSFB's violation of I.C. 23-2-1-12, Indiana Statutes, FIRST BANK has suffered damage and is entitled to the remedies provided at I.C. 23-2-1-19.

36

WHEREFORE, FIRST BANK respectfully requests that this Court enter judgment in its favor for:

(a)  its damages caused by CSFB's violation of the Indiana Securities Act, including rescission, prejudgment and post judgment interest and reasonable attorneys' fees, and costs pursuant to I.C. 23-2-1-19; and

(b)  such other and further relief as this Court considers appropriate.

## DEMAND FOR TRIAL BY JURY

FIRST BANK hereby demands a trial by jury on all issues so triable pursuant to Federal Rule of Civil Procedure 38.

Dated: September 28, 2007                    Respectfully submitted,

GEORGE ROBERT DELOACH, JR.
Indiana Bar No. 4473-98
Email: gdeloach@dlsecuritieslaw.com
Ledbetter & Associates, P.A.
350 E. Las Olas Boulevard
Suite 1220
Fort Lauderdale, Florida 33301
Telephone: (954) 766-8730
Facsimile: (954) 766-7800
Co-Counsel for Plaintiff

DALE LEDBETTER
Tennessee Bar No. 008953
Email: dledbetter@dlsecuritieslaw.com
Ledbetter & Associates, P.A.
350 E. Las Olas Boulevard
Suite 1220
Fort Lauderdale, Florida 33301
Telephone: (954) 766-7875
Facsimile: (954) 766-7800
Co-Counsel for Plaintiff

37

THOMAS K. CALDWELL
Indiana Bar No. 16001-49
Email: tkcaldwell@mhclaw.com
Maddox Hargett & Caruso, P.C.
10100  Lantern Road
Suite 150
Fishers, Indiana 46037
Telephone: (317) 598-2040
Facsimile: (317) 598-2050
Co-Counsel for Plaintiff

MARK E. MADDOX
Indiana Bar No. 11252-49
Email: mmaddox@mhclaw.com
Maddox Hargett & Caruso, P.C.
10100  Lantern Road
Suite 150
Fishers, Indiana 46037
Telephone: (317) 598-2040
Facsimile: (317) 598-2050
Co-Counsel for Plaintiff